**FIFTH THIRD UNION TRUST COMPANY, Trustee, Plaintiff, v. ATHENAEUM OF OHIO AND INSTITUTUM DIVI THOMAE, Defendants.**

Probate Court, Hamilton County.

No. 190323.   Decided March 25, 1959.

Frost & Jacobs, Henry W. Hobson, Jr., for The Fifth Third Union Trust Company, Trustee under Item IV of the Last Will and Testament of Richard K. LeBlond, deceased.

Dempsey & Dempsey, Harmon, Colston, Goldsmith & Hoadly, Henry B. Street, for The Athenaeum of Ohio.

Paxton & Seasongood, Robert P. Goldman, William T. Bahlman, Jr., Arnold Morelli, for Institutum Divi Thomae.

## OPINION

By DAVIES, J.:

The Fifth Third Union Trust Company, as Trustee under Item IV of the Last Will and Testament of Richard K. LeBlond, deceased in a petition for instructions, has asked for "judgment and direction of the Court as to which" of two defendants, The Athenaeum of Ohio, or the Institutum Divi Thomae, is entitled to an undivided one-fifth interest in the real estate referred to in said Item IV.

After making certain specific bequests, the testator, in Item IV of his will, gave the residue of his estate to the Fifth Third Union Trust Company of Cincinnati, Ohio, with a direction that the trustee maintain such home or homes he might own at the time of his death and permit his wife, Loretto H. LeBlond, to occupy said home or homes, without charge, "so long as she shall live and desire to do so."

The testator's will also contains the following provisions:

"Upon the death of my wife, - - - or upon my death should I survive my wife, I direct the Trustee:

"(a) To convey my home, known as No. 3660 Vineyard Place, Cincinnati, Ohio, free of the Trust, to the Institutum Divi Thomae, the research department of The Athenaeum of Ohio, or its nominee, for its use, in fee simple and absolutely - - -,

"I direct that my Executors or Trustee shall not sell or convey the real estate immediately hereinbefore described (the Vineyard Place property) without the consent of my wife - - - so long as she makes it her home. In the event that my said wife shall, during her lifetime, give written notice to the Trustees that she no longer desires to make said real estate her home, then the Trustees shall thereupon convey said real estate to the Institutum Divi Thomae, the Research Department of the Athenaeum of Ohio, or its nominee."

Mr. LeBlond's will was executed on January 6, 1948. He died on March 17, 1953. His wife, Loretto, died on January 3, 1958. In two codicils, executed on June 18, 1952, and on September 4, 1952, Mr. Le-Blond made changes in his original will, but they did not affect his real estate on Vineyard Place. In both codicils the testator ratified and confirmed his Last Will and Testament in all other respects.

The Athenaeum of Ohio is a corporation not for profit, organized under the laws of Ohio in the year 1928 for the purpose of controlling Catholic educational institutions within the Archdiocese of Cincinnati. Originally, the diocesan high schools, Our Lady of Cincinnati College, the Teachers College, St. Gregory Seminary, St. Mary's Seminary, and later, as hereinafter set forth, the Institutum Divi Thomae, came under the control of the Athenaeum, which conferred degrees upon graduates of its member institutions.

The Institutum Divi Thomae came into existence on December 27, 1934, when, as a result of previous conversations between John T. McNicholas, Archbishop of Cincinnati, George Speri Sperti, who was a professor and director of the Basic Science Research Laboratory of the University of Cincinnati, and others, Archishop McNicholas, Dr. Sperti, Cletus A. Miller, Bertrand Bailey, Joseph H. Albers, and John C. Dempsey signed the following declaration:

"We the undersigned Archbishop of Cincinnati and President ex officio of the 'Athaenum of Ohio' hereby found the **Institutum Divi Thomae** and further declare said Institutum duly founded with all the rights and privileges belonging to such Institutions of higher learning.

"The purpose of aforesaid Institutum is to persue (sic) higher studies or graduate work under the inspiration of the Catholic Church and in conformity with the laws of the State of Ohio. Its special scope will be to study questions of Holy Scripture Theology, Philosophy, History and Law Etc. in so far as they are related to the Physical or Natural Sciences and to study ex professo Scientific questions of Higher Institutions of Learning or Graduate Schools.

"We hereby appoint the Reverend Cletus A. Miller Moderator of said Institutum and Dr. George Sperti and John C. Dempsey members of the Board of Regents of the 'Institutum Divi Thomae.'

"In testimony whereof we have hereunto set our hand and placed our seal of the Archbishop of Cincinnati on the 27 day of December in the Year of Our Lord 1934.

"John T. McNicholas
Archbishop of Cincinnati
George Sperti
Cletus A. Miller

Bertrand Bailey
· Joseph H. Albers
John C. Dempsey."

Dr. Sperti resigned his positions with the University, and, after further discussions and negotiations, John T. McNicholas, as Archbishop of Cincinnati, as President ex officio of The Athenaeum of Ohio, and as Trustee for St. Gregory Seminary, and George Speri Sperti, individually, on May 15, 1935, entered into a written contract which recited that The Athenaeum of Ohio was opening a new unit, to be known as the Institutum Divi Thomae, for theoretical and industrial research, in general science, with its location in St. Gregory Seminary for a period of six years. The agreement further provided that if it should be possible for the Archdiocese to erect a distinct building for theoretical and industrial research for the Institutum Divi Thomae it "shall be operated under the direction of and as an affiliate of the Athenaeum of Ohio" and that Dr. Sperti "shall be director of said Institutum Divi Thomae during his lifetime."

The agreement provided that any patents and profits that might come from industrial research work, done at the Institutum, "shall belong absolutely, and unconditionally, to said George Speri Sperti, in his individual right." At the end of each year, the Archbishop and Dr. Sperti agreed to determine what division of expenses would be made for theoretical research and for industrial research. The Archbishop undertook to seek donations for theoretical research and Dr. Sperti agreed to take care of the raising of funds for the expenses of industrial research. The Archdiocese advanced $135,000. for the operation of the theoretical and industrial research for the Institutum for a three year period.

Dr. Sperti agreed that he and the members of the staff of the Institutum would direct and supervise courses, and give lectures, on scientific subjects in Catholic colleges within the Archdiocese of Cincinnati and would help to train Priests, Brothers, Sisters, lay men and women, and thereby qualify them to take up scientific work in colleges and universities throughout the country, "and thus to help counteract the atheistic and anti-God movement that is spreading so rapidly among persons in the scientific world and the so-called intelligentsia."

The agreement also provided that all equipment of the Institutum, both for theoretical and industrial research, should belong to Dr. Sperti, as his personal property, and that interested friends of the Institutum would seek donations to pay back the Archdiocese such sums of money as might be expended by it for the equipment of the Institutum.

On or about May 15, 1935, the Institutum, with Dr. Sperti as its director, began its operations in the basement of St. Gregory Seminary in Cincinnati. Its faculty and student body grew. Its program included the activities outlined in the aforementioned agreement. It outgrew its quarters.

Improved real estate was acquired at 1840 Madison Road, in Cincinati, and the Institutum was relocated at that address two years before Archbishop John T. McNicholas, on June 26, 1942, as Trustee for the Roman Catholic Archdiocese of Cincinnati, executed a formal declaration

of trust, in which it is recited that he, and his successors in office, would hold title to the Madison Road property in trust for the Institutum Divi Thomae Foundation "in the fulfillment of the purpose for which it was founded and chartered." Subsequently, the property was transferred by Archbishop McNicholas to the Institutum Divi Thomae Foundation, and title to said property still remains in the name of said Foundation, of which Dr. Sperti is president.

The Institutum Divi Thomae Foundation was incorporated as a corporation not for profit under the laws of Ohio on July 18, 1940. Its purposes were to create, accumulate and maintain a fund or endowment, comprised of monies, securities and other property, real and personal, for the promotion and cultivation of religion, education, morality and the fine arts; and, in that regard, to manage, deal with and disburse said fund or endowment in the establishment, support and conduct of an institution or institutions of learning, comprising all departments of knowledge, and especially those branches covered in graduate and re-search courses of college and university grade; to establish, finance, maintain and conduct an institute or institutes for graduate work in theoretical and industrial research in all branches of the pure and applied sciences; to affiliate or to consolidate itself or any institute or institutes which it may found and maintain with other educational or professional organizations established to do work similar, related or auxiliary to its or their programs; and to grant, through such institutes as it may found and maintain, such academic degrees as are usually conferred for .completion of such courses of study as may be offered and conducted therein. Dr. Sperti, his sister, Mildred, and Reverend Cletus A. Miller were made trustees of the Foundation.

The Institutum Divi Thomae Foundation is secular in character. The Archdiocese of Cincinnati has no interest in its buildings, and the Archbishop has nothing to do with its operations. The Foundation owns real estate in various parts of the country and also has collected and accumulated personal property. The Foundation has made regular con-tributions to, but has no connection with, the Institutum Divi Thomae.

The Institutum Divi Thomae continued to grow and prosper. Under the direction of Dr. Sperti and with the cooperation of the Athenaeum of Ohio, the Archbishop, and the Archdiocese of Cincinnati, the student body of the Institutum increased. Its faculty was enlarged. Its graduates were given degrees by the Athenaeum of Ohio. Its research work was widely publicized, and Dr. Sperti received wide personal acclaim. He was made a member of the Pontifical Academy, composed of seventy scientists appointed by the Pope. Revenues were received and funds accumulated as a result of the activities of the Institutum. Supplemental agreements were entered into by the principals. The first one, dated September 30, 1937, and signed by John T. McNicholas, as Archbishop and "Trustee for the Institutum Divi Thomae" and George S. Sperti, as "Director of the Institutum Divi Thomae," provided that the net earnings of the Insti-tutum would be divided as follows: Thirty per cent to the Institutum Divi Thomae (a) for the payment of any outstanding indebtedness, and (b) thereafter, for maintenance and expansion purposes in accordance

with the decision of the director, Dr. George S. Sperti, Thirty per cent to the Archdiocese of Cincinnati for such purposes as the Ordinary might designate; and Forty per cent for such experimental and research work of the Institutum as Dr. Sperti, in his full discretion, might determine upon.

On November 3, 1938, John T. McNicholas, as Archbishop, as Trustee for St. Gregory Seminary, where the Institutum was located, and as President of The Athenaeum of Ohio, and George Speri Sperti, as President, and Mildred Sperti, as Secretary, of the Institutum Divi Thomae signed an agreement in which it was recited that the "Institutum Divi Thomae shall be operated under the direction of, and as an affiliate to, The Athenaeum of Ohio, as its department of graduate research in general science." The agreement further provided that "all patents, and royalties and profits accruing therefrom, which may be based upon industrial research work done at the Institutum Divi Thomae, shall be assigned to The Institutum Divi Thomae Foundation, as the fiscal agent, respectively, of the Institutum Divi Thomae of The Athenaeum of Ohio and of the Archdiocese of Cincinnati; any (net) profits therefrom to be divided" as follows: 30% to the Institutum Divi Thomae for payment of its debts and for maintenance and expansion; 30% to The Athenaeum of Ohio; and 40% to the Institutum Divi Thomae Foundation.

The agreement also stipulated that should the Institutum Divi Thomae cease, for any reason, to function as an affiliate of the Athenaeum, or should Dr. Sperti sever his connection with either or both of said institutions, there "should be no division of profits from new discoveries made after the said Institutum shall have discontinued its affiliation with The Athenaeum of Ohio, or after said Dr. George Speri Sperti shall have severed his relationship to either or both of said institution."

By the terms of another supplemental agreement, dated November 20, 1939, the parties agreed upon a plan for the repayment of indebtedness of the Institutum Divi Thomae to the Archdiocese of Cincinnati and for a division of the net profits of the Institutum between the Institutum, the Athenaeum and the Foundation. The agreement also provided that the Institutum would be "operated under the direction of, and as an affiliate to, The Athenaeum of Ohio, as its department of graduate research in general science." The agreement also provided that if the Institutum ceased for any reason to function as an affiliate of the Athenaeum, or failed to carry on its scientific research work in accordance with Dr. Sperti's program, or should Dr. Sperti sever his connection with the Institutum, the accumulated indebtedness due the Archdiocese should be paid, and the subsequent distribution of profits be divided between (10%) the Archdiocese, and (90%) The Institutum Divi Thomae Foundation.

As Dr. Sperti proceeded with his work as director of the Institutum Divi Thomae, he, as a scientist, inventor and research specialist, originated and developed many discoveries and inventions for which he personally received completed Letters Patent. He was instrumental in creating Sperti, Inc., a corporation which merchandized his inventions.

He also had a working arrangement with The Institutum Divi Thomae Foundation concerning the handling, maturing and merchandizing of the products resulting from the sale of his discoveries, inventions and developments.

While (prior to 1934) serving as director of the Basic Science Research Laboratory at the University of Cincinnati, Dr. Sperti became acquainted with Monsignor (then Father) Cletus A. Miller, Chaplain of The Newman Club at the University, who introduced Dr. Sperti to Archbishop McNicholas. The Archbishop was interested in the research work Dr. Sperti was doing at the University and was particularly interested in doing something to prove there is no inconsistency between the scientist's work and his religion. Conversations between the Archbishop, Dr. Sperti, and others, as noted, resulted in the creation of the Institutum Divi Thomae in 1934. Monsignor Miller became Dean in charge of administration of the Institutum shortly after its formation and served as its dean until August, 1949.

Richard K. LeBlond, one of Cincinnati's leading industrialists, met Monsignor Miller at the Newman Club at the University and later, when Monsignor Miller was Dean of the Institutum Divi Thomae, Mr. LeBlond became interested in the work of the Institutum. He gave some equipment to the Institutum.

Mr. LeBlond was a friend of Archbishop McNicholas and, some time prior to 1948, Mr. LeBlond told Monsignor Miller he admired the work the Archbishop and he were carrying on at the Institutum and that he was thinking about "donating" his home, which consisted of a spacious house located on beautifully landscaped grounds in suburban Cincinnati, valued at approximately a quarter of a million dollars. He said he wouldn't do it while he and Mrs. LeBlond were alive. The testimony is vague as to whom Mr. LeBlond was thinking about donating his home, although he did say he was going to give it to the Catholic Church or the "Archdiocese of Ohio."

It is unlikely, as shown by the testimony, that Mr. LeBlond, when he executed his will, understood the organizational status of the Institutum Divi Thomae or its relationship to the Athenaeum of Ohio, and he was unfamiliar with The Institutum Divi Thomae Foundation. He did believe that Archbishop McNicholas and the Catholic Church were actively interested in the operations of the Institutum Divi Thomae. He had no conversations with Dr. Sperti about his will.

The Institutum continued to grow and to expand its activities until it had fourteen units located in Cincinnati, Ohio, and other states. It continued until about some time shortly before May 29, 1952, to have the full cooperation and support of the Archbishop, the Archdiocese of Cincinnati, The Athenaeum of Ohio, and The Institutum Divi Thomae Foundation. As stated, degrees and diplomas of affiliated institutions (the Diocesan Teachers' College, Saint Gregory Seminary, Saint Mary's Seminary, Our Lady of Cincinnati College, and the Institutum Divi Thomae) were awarded by The Athenaeum of Ohio.

When Archibishop McNicholas died in April, 1950, he was succeeded in office by Archbishop Karl J. Alter.

At a meeting of the Trustees and members of The Athenaeum of Ohio, held on May 28, 1951, the following resolution was adopted:

"(a) WHEREAS the responsibilities of the Board of Trustees and of the Athenaeum of Ohio under its Charter and By-Laws are not sufficiently defined; and

"(b) WHEREAS the structure, function, policies, and duties of officers of the respective divisions of the Athenaeum are not set forth specifically in writing: Therefore be it

"RESOLVED, That an educational survey be initiated as soon as possible, in order to bring about such clarification of rights, duties, and responsibilities respecting the various divisions and respecting, furthermore, the reorganization of its various divisions and their inter-relationship, and a report be submitted to the Board of Trustees for its judgment and action respecting future operations; and be it

"RESOLVED further, That this educational survey be made by a qualified standardizing agency, such as the Catholic University of America, or the Ohio Department of Education, or the North Central Association of Colleges and Universities, this survey to include an evaluation of the curriculum of Teachers College and of the Institutum Divi Thomae."

The Catholic University of America made the educational survey called for in the aforementioned resolution and, based upon the recommendations of this survey, the trustees and members of The Athenaeum of Ohio, on May 29, 1952, passed a number of resolutions. The Athenaeum discontinued granting of diplomas and degrees to high school students, graduates of the Teachers' College, the Institutum Divi Thomae, and Our Lady of Cincinnati College, beginning with the year 1953, or as soon thereafter as these institutions would qualify, on their own responsibility and charters, to assume this function.

It was also resolved at the meeting on May 29, 1952, that "the Athenaeum suspend operation of the Institutum Divi Thomae as a department of the Athenaeum, with the proviso that all rights and duties be transferred to some recognized university or (of) graduate character, or to some accredited research institute."

The State of Ohio Department of Education gave the Institutum Divi Thomae authority to confer the degree of Master of Science on and after January 8, 1944, and the authority to confer the degree of Doctor of Philosophy on and after May 28, 1945.

After its suspension as a department of the Athenaeum, the Institutum Divi Thomae continued its operations much as it did before the suspension, except that degrees were rendered directly by the Institutum rather than by the Athenaeum. In December, 1955, the Institutum Divi Thomae was incorporated as a corporation not for profit under the laws of Ohio, and it has continued its operations up until the present time as a corporation under the presidency and direction of Dr. Sperti. Its Madison Road real estate is still owned by the Institutum Divi Thomae Foundation and it still receives financial support from the Foundation of which Dr. Sperti is president. The Institutum Divi Thomae Corporation is permitted, under the provisions of its articles of incorporation, to acquire, own and hold money, securities, real estate, patent rights

and licenses, chattels and other property, necessary, convenient or proper for carrying out the objects of the corporation.

After executing his will on January 6, 1948, Richard K. LeBlond concluded that it would be advantageous for him, from a tax angle, to donate his home on Vineyard Place by deed of gift during his lifetime, rather than by will at the time of his death. He conferred with his attorney and instructed him to communicate with the Catholic Chancery in Cincinnati about the exact name of the grantee. The attorney advised Mr. LeBlond that, from a tax consideration, he should execute a series of five deeds, one each year for five successive years. The Chancery, through its attorney, wrote the following letter, dated December 19, 1951, to Mr. LeBlond's attorney:

"The Athenaeum of Ohio is a corporation not-for-profit, organized under the laws of the State of Ohio.

"The Institutum Divi Thomae is a division of the Athenaeum of Ohio, for the purpose of carrying on scientific research and instruction in science. The corporate entity is the Athenaeum of Ohio. It is a public institution of learning, and any gift to it would be exempt from the Succession Tax, under §5334 GC. (now §5731.09 R. C.)"

Mr. LeBlond and his wife, Loretto, then executed four deeds dated respectively December 29, 1951, June 6, 1952, December 26, 1952, and (executed by his attorney in fact) March 10, 1953, each deed conveying an undivided one-fifth interest in the Vineyard Place property to "The Athenaeum of Ohio, Grantee, a corporation not for profit, organized under the laws of Ohio, whose address is 5418 Moeller Avenue, Norwood, Ohio, the receipt whereof is hereby acknowledged, does hereby GRANT, BARGAIN, SELL AND CONVEY to the said Grantee for its Research Department now known as Institutum Divi Thomae - - -." Each deed reserved life estates in favor of the grantor and his wife during their lifetimes. These four deeds were delivered to Archbishop Karl J. Alter, as President of The Athenaeum of Ohio. Mr. LeBlond died on March 17, 1953, before he was able to execute his final deed to convey the whole of his Vineyard Place home to The Athenaeum of Ohio, for its Research Department now (March 17, 1953) known as Institutum Divi Thomae.

Under these circumstances, the plaintiff-trustee has prayed for judgment and direction of the court as to which of the defendants is entitled to the one-fifth remaining interest in the home real estate, passing under the testator's will, and as to its (the trustee's) duties in the premises.

The cardinal rule of interpretation of a will is to ascertain the meaning and intention of the testator. **Anderson v. Gibson, 116 Oh St 684,** 157 N. E. 377; **Cleveland Trust Co. v. Frost et al, 166 Oh St 329; Holmes v. Hrobon, 93 Oh Ap 1.** In the interpretation of a will, the intent of the testator must be ascertained primarily from within the four corners of the will. **The Third National Bank & Trust Co. v. Davidson et al, 157 Oh St 355.** The intention must be ascertained from the language used in the will, as applied to the subject-matter and read in the light of surrounding circumstances at the time of the execution thereof, and not with reference to the circumstances at the time of the death of the

testator, except insofar as the latter are connected with the former. **41 O. Jur. 595, Sec. 468.**

While the controlling principle in the construction of wills is the ascertainment of the intention of the testator, where the intention remains in doubt, resort must be had to settled rules of construction for aid in the solution of the difficulty. **Linton v. Laycock et al, 33 Oh St 128.** Words in a will are to be understood according to their ordinary, natural, and legal signification, unless it is manifest from the context, or from other provisions in the will, that the testator has used them in a different sense, and unless the sense in which they were used is clearly apparent. **Carter v. Reddish et al, 32 Oh St 1.** The language of a will is to be given its ordinary legal significance, unless a contrary intention on the part of the testator appears from the will itself, interpreted in the light of the circumstances of which testator knew. **Heath v. Cleveland, 114 Oh St 535,** 151 N. E. 649.

When there is a latent ambiguity in the details · of a testator's will, extrinsic evidence may be admitted to determine the intent of the testator. A latent ambiguity is one where language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or some extraneous evidence creates a necessity for interpretation of a choice among two or more possible meanings. If a will is ambiguous, extrinsic evidence as to circumstances surrounding testator at time will was executed is admissible. Hays, ex'r. v. Illinois Industrial Home for the Blind, 12 Ill. (2d), 625, 147 N. E. (2d), 287.

Doubt has arisen from a reading of the testator's will as to the exact identity of the devisee to whom he intended his trustee to convey title to his home at the death of his wife, because, for one reason, at the time he made his will, when he executed the codicils to his will, at the time of his death, and at the time of his wife's death, the Institutum Divi Thomae could not take or hold property in its own name because unincorporated associations, clubs, and societies, unless recognized by statute, have no legal existence. Accordingly, in the absence of statutory authorization, which does not exist in Ohio, organizations such as the Institutum Divi Thomae, being at the date of the testator's death an unincorporated society, could not take or hold property in the association's name, either by way of gift · or purchase. 4 Am. Jur. 477; 16 Am. Jur. 488, par. 88; Patton on Titles, 2d ed., Vol. 2, p. 230, par. 406.

Another latent ambiguity, shown by the testimony, has arisen because the Institutum Divi Thomae and The Athenaeum of Ohio are two separate organizations.

In the Hays case, supra, the testatrix bequeathed one-third of the residue of her estate to the "Industrial Home for the Blind (commonly called Lighthouse for the Blind)." The Industrial Home for the Blind and the Lighthouse for the Blind were two separate organizations. The former contended that the language of the will was not ambiguous since only one organization is actually described, and argued that the parenthetical clause ("commonly called Lighthouse for the Blind") is simply descriptive and the court should, therefore, reject the language within the parenthesis leaving the "Industrial Home for the Blind"

described with exactitude. The court held that there was a latent ambiguity (which it described as "one where language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or some extraneous evidence creates a necessity for interpretation of a choice among two or more possible meanings") in the will and permitted the admission of parol testimony to show not what the testatrix meant to say but "what she meant by what she said." The court, after hearing the parol testimony, concluded that the testatrix intended to convey the one-third residue of her estate to "The Chicago Lighthouse for the Blind," the actual name of the "Lighthouse for the Blind" (as designated in the will). The court pointed out that the "Industrial Home for the Blind" was not "commonly called Lighthouse for the Blind." The court also held that a court may reject superfluous or repugnant words from a will "whenever necessary to effectuate (a) testator's intention as expressed therein."

In the case of Evans v. The Volunteers of America, 280 S. W. (2d) 1 (Supreme Court of Missouri), the testatrix bequeathed property to the "Volunteers of America, commonly known as the Salvation Army." These also were two separate organizations. The Volunteers of America argued that there was no ambiguity in the will because the "plain, grammatical meaning of the will is that the Volunteers of America is the legatee named and the phrase, 'commonly known as the Salvation Army,' is merely parenthetical and descriptive and should be ignored as surplusage." The court, however, held that there was a latent ambiguity in the language used because the Volunteers of America and the Salvation Army were two separate, independent corporations and not one organization known by the two names. The testimony showed that the testatrix frequently mentioned the Salvation Army as a worthwhile organization and indicated that the Salvation Army was her favorite charity. The court held that the testatrix intended to name the Salvation Army as the beneficiary of the bequest made to the "Volunteers of America, commonly known as the Salvation Army."

Courts sometimes have held that where a testator devises property to an unincorporated organization connected with a religious or other corporation of which the unincorporated society is an affiliated or subordinate part, the testator is presumed to have intended the devise to be made to such corporation for the benefit of the unincorporated organization. Indianapolis Home for the Aged v. Altenheim of Indianapolis et al, 93 N. E. (2d) 203; In re: Sattler's Will, 152 N. Y. Supp. (2d) 38; Church of the Holy Name of Jesus at Providence v. Deserving Poor Boys Priesthood Ass'n. et al, 38 Atl. 143; First Methodist Church of Penn Yan v. Putnam et al, 72 N. Y. S. (2d), 70, 139 Misc. 519; In re: Jaques' Will, 73 N. Y. Supp. (2d) 118; Kernochan v. Farmers Loan & Trust Co. et al, 175 N. Y. Supp. 830. Counsel for the Institutum Divi Thomae contend that the testator left his home to the Institutum Divi Thomae, the Research Department of The Athenaeum of Ohio, **or its nominee** (emphasis added), because he knew that the Institutum, being unincorporated, could not hold title to the devised real estate and, hence, intended to provide that it was to be given either to the Institutum Divi Thomae or to its (the Institutum Divi Thomae's) nominee.

Neither the language of the LeBlond will, nor the testimony, however, shows that the testator intended that the legal title to his real estate should vest in the trustee or anyone else for the benefit of the Institutum Divi Thomae until such time as the Institutum would be able to take or hold title to the real estate in its own name.

Counsel for The Athenaeum of Ohio argued that when the will was executed, and at the time of the testator's death, only The Athenaeum of Ohio was capable of holding title to the devised realty because the words "its nominee," immediately following "The Athenaeum of Ohio" in the testator's will, under rules of syntax, can apply only to the Athenaeum. The Athenaeum of Ohio also claimed that the Institutum Divi Thomae bore the same relationship to the Athenaeum as a college bears to a university, of which it is a part, and, as such, the Institutum had no separate legal identiy, and, hence, by the use of the term "nominee" in the will, the only possible construction to be placed on the wordiig of the will is that the testator intended that the word "nominee" should refer to "The Athenaeum of Ohio." The evidence, however, which is hereinafter more fully discussed, shows that this was not exactly the intention of the testator.

It will be remembered that the testaor directed his trustee upon the death of his wife, to convey the testator's home "to the Institutum Divi Thomae, the Research Deparment of The Athenaeum of Ohio, or its nominee, for its use, in fee simple and absolutely - - -." A reading of the testator's entire will and codicils does not indicate that he intended to identify any particular devisee by the use of the word "nominee," which ordinarily indicates one designated to act for another as his representative in a rather limited sense. It is used sometimes to signify an agent or trustee. It has no connotation other than that of acting for another, in representation of another, or as the grantee of another. Schuh Trading Co. et al. v. Commissioner of Internal Revenue, 95 Fed. Rep. (2d), 404, at p. 405.

The two "its" are the key words used by the testator. In an attempt to ascertain what meaning he ascribed to these two "its" used in the quoted part of his will, the court, with the consent of counsel, sought the opinion of two prominent English scholars, Dr. William S. Clark, Professor of English and Chairman of Department of English, University of Cincinnati, and Dr. Charles F. Wheeler, Professor of English and Chairman of Department of English, Xavier University.

Dr. Wheeler and Dr. Clark, without considering any of the facts or surrounding circumstances of the case, and viewing the matter purely as a grammatical problem, arrived at the following conclusion as to the meaning of the words "its," the two personal pronouns, neuter gender, possessive case, used by Richard K. LeBlond in his will:

"In determining the antecedent of its, the following considerations are relevant:

"1. The antecedent is either 'the Institutum Divi Thomae' or 'The Athenaeum of Ohio.'

"2. The phrase, 'the research department of The Athenaeum of Ohio,' stands in apposition to describe and identify 'the Institutum Divi Thomae.' As such, it is a kind of parenthesis inside commas.

"3. If the testator had intended the antecedent of *its* to be 'The Athenaeum of Ohio,' it does not seem likely that he would have written the sentence as it stands. We offer these reasons:

"a. In 'the research department of The Athenaeum of Ohio' the words, 'of The Athenaeum of Ohio,' constitute a prepositional phrase within the appositional phrase.

"b. The ambiguity of that syntactical arrangement—designating an important beneficiary by means of a prepositional construction within the appositional phrase—would quite probably have occurred to the testator if he had intended to name 'The Athenaeum of Ohio' as the alternative recipient of his residue. Therefore, instead of writing 'or its nominee,' he would have written 'or, if the Institutum Divi Thomae does not accept, the nominee of The Athenaeum of Ohio.'

"Conclusion: Logically and syntactically, therefore, it seems that the antecedent of *its* is the term, 'the Institutum Divi Thomae,' further identified as 'the research department of The Athenaeum of Ohio.'"

If it were not for the surrounding circumstances, which are hereinafter discussed, and if grammar was the only factor to be considered in deciding the case, the two "its" would refer to "the Institutum Divi Thomae." Mr. LeBlond was not a grammarian. He depended upon the lawyer who drafted his will to employ that language which would dispose of his property in accordance with the instructions which he gave. Mr. LeBlond was not familiar with the detailed organization of, and relationships between, the Institutum Divi Thomae, The Institutum Divi Thomae Foundation, and The Athenaeum of Ohio, and he did not understand the exact connections between these three organizations and the Catholic Archdiocese of Cincinnati. He was interested, as he stated, in the Institutum Divi Thomae, in whose operations he understood Archbishop McNicholas and the Catholic Church had an active part. He did state before making his will that he intended to give his home to the Catholic Church. As shown by the four deeds executed by Mr. LeBlond, which are hereinafter more fully discussed, he was especially interested in the work of The Athenaeum of Ohio.

The construction of words used by a testator, as well as the use of rules of grammar in construing wills, is important. **41 O. Jur. 638, Sec. 598.** Grammatical accuracy, however, need not be observed in the construction of a will. No regard is had to the form a testator adopts to express his intention; more consideration is paid to substance than to form. The obvious intention of the testator must prevail over the strict grammatical construction of his testamentary language. In other words, the grammatical construction or order of particular sentences in the will is not allowed to defeat the general intention of the testator if that intention is clearly manifested by the provisions of the will as a whole. **41 O. Jur. 638, Sec. 509.** Mere punctation, if it renders doubtful or ambiguous the intention of the testator, may be disregarded if, from other circumstances, a reasonable construction of the testator's intention may be arrived at. Youtsey v. Bowman et al, 6 O. N. P. (ns) 381, 18 O. D. N. P. 577.

As defined in §2107.01 R. C., the word "will" includes "codicils." A codicil republishes the original instrument to which it refers, bringing

it down to the date of the codicil. **In re: Lorenz, 38 Abs 238, 49 N. E. 62.** Under the allegation that a will and two codicils are invalid, the validity of a third codicil, not mentioned in the petition, but which republishes the will, as of the date of such last codicil, may be contested. Trull v. Patrick et al, 22 O. N. P. (ns) 385. A will must be construed as if the testator had inserted in the codicil all the words of the will. In re: Spangenberg Estate, 359 Pa. 353. A devise, which was void when made, because in violation of the statute against perpetuities, was validated when ratified and confirmed by a codicil executed after the repeal of the statute. Morse v. Ward et al. (Conn.), 103 Atl. 119. If a codicil is properly executed, and if it contains a sufficient reference to a prior will, it republishes such will as of the date of the codicil. Page on Wills, Chapt. 17, Sec. 545. The due execution of a codicil has the effect of republishing a will. In re: Ayres' will (Ct. of Ap. of Ohio, Franklin County), 43 N. E. (2d), 918; In re: Hayne's Estate, 133 Pac. 277; Taft v. Stearns et al. (Mass.), 125 N. E. 570; Groots v. Cashburn, 295 Ill. 286, 129 N. E. 137; In re: Greenberg's Estate, 261 N. Y. 474, 185 N. E. 704. In construing a will with codicils, the whole is to be taken together as parts of one instrument. **Negley v. Gard, 20 Ohio 310.** A will and codicil are to be taken and construed together, as parts of one and the same instrument, and the intent of the testator gathered from the whole. **Collier v. Collier's Exec'rs, et al, 3 Oh St 369.**

A will ordinarily speaks as of the death of the testator. **In re: Estate of Evans, 165 Oh St 27.** Property vests at time of death of testator. **Holt v. Miller et al, 133 Oh St 418.** The law favors the vesting of estates at the death of the testator unless a different intention is gathered from the whole will. **McCulloch v. Yost, 148 Oh St 675; Trumbo v. Trumbo et al, 106 Oh Ap 382; Bolton v. Bank, 50 Oh St 290, 33 N. E. 1115.** The law favors the vesting of estates at the earliest possible moment, and a remainder after a life estate vests in the remainderman at the death of the testator, in the absence of a clearly expressed intention to postpone the vesting to some future time. **The Ohio National Bank of Columbus, Trustee, v. Boone et al, 139 Oh St 361, 40 N. E. (2d), 149, 144 A. L. R. 1150; Tax Commission v. Oswald, exrx., 109 Oh St 36, 141 N. E. 678; Johnson v. Johnson, 51 Oh St 446, 38 N. E. 61; The First National Bank of Cincinnati, Exr. et al, Appellees, v. Tenney, Appellee, 165 Oh St 513.**

Richard K. LeBlond did not, in his will, devise his home to the "Institutum Divi Thomae," the "Institutum Divi Thomae, the Research Department of The Athenaeum of Ohio," "The Athenaeum of Ohio," or to "The Athenaeum of Ohio, a corporation not for profit, for its Research Department now known as the Institutum Divi Thomae." He did devise his home to "the Institutum Divi Thomae, the Research Department of The Athenaeum of Ohio, or its nominee, for its use, in fee simple and absolutely." He did, after the execution of his will, transfer by four general warranty deeds, four-fifths of the undivided interest in his home real estate to "The Athenaeum of Ohio, a corporation not for profit, - - - for its Research Department now known as Institutum Divi Thomae." He intended, as shown by the testimony, to convey the remaining one-fifth interest in said real estate, and if he had lived a short

time longer he would have transferred said one-fifth remaining interest in said real estate, to "The Athenaeum of Ohio, a corporation not for profit, - - - for its Research Department now known as Institutum Divi Thomae."

The four deeds were executed on December 29, 1951, June 6, 1952, December 26, 1952, and March 10, 1953. The codicils to the testator's will were executed on June 18, 1952, and on September 4, 1952. Mr. LeBlond's will was executed on January 6, 1948, and he died on March 17, 1953. It is significant that he had transferred, by the two deeds dated December 29, 1951 and June 6, 1952, an undivided two-fifths interest in his real estate to "The Athenaeum of Ohio, a corporation not for profit, - - - for its Research Department now known as Institutum Divi Thomae," when, on June 13, 1952, and on September 4, 1952, he executed codicils to his will in which he specifically ratified, confirmed, and republished the will he had executed on January 6, 1948. After ratifying and confirming his will by these two codicils, he, as stated, executed and delivered two additional deeds, one on December 26, 1952, and one on March 10, 1953, in each one of which he conveyed an additional undivided one-fifth of his real estate to the same grantee, "The Athenaeum of Ohio, a corporation not for profit, organized under the laws of Ohio, - - - for its Research Department now known as Institutum Divi Thomae."

It is highly illogical to believe that Mr. LeBlond, by the language used in his will, in the light of the circumstances existing at the times of the execution of his will and the two codicils thereto, intended that the title to an undivided four-fifths interest in his home would vest in The Athenaeum of Ohio for its Research Department known as the Institutum Divi Thomae, or any other grantee, and that the remaining undivided one-fifth interest in said real estate would vest at the date of his death in the Institutum Divi Thomae or in some other devisee as tenants in common. It is logical to assume that the testator intended that the remaining undivided one-fifth interest in said real estate owned by him at the date of his death would vest in the institution to which, after executing his will which was subsequently republished by two codicils, he conveyed by general warranty deeds an undivided four-fifths interest, and to whom he unquestionably intended to convey, and would have conveyed if death had not intervened, the remaining one-fifth interest in said real estate. By his own actions, shown in four separate deeds, he clearly indicated an intention to devise the remaining one-fifth interest in his home to "The Athenaeum of Ohio, a corporation not for profit, - - - for its Research Department now known as Institutum Divi Thomae," and intended that title to said one-fifth interest would vest in said devisee at the date of his death.

By his deliberate acts, the execution and delivery of four separate deeds, Mr. LeBlond showed that he intended the two "its" in his will to refer to the same devisee in his will as the grantee named in the four deeds which were executed by him and his wife.

We, therefore, conclude that it was the intention of the testator, in the instant case, as ascertained from the language used in his will, and read in the light of the circumstances which existed when his will and

codicils thereto were executed, that his trustee, upon the death of the testator's wife, should convey the remaining undivided one-fifth interest in his home, located on Vineyard Place, Cincinnati, Ohio, to "The Athenaeum of Ohio, a corporation not for profit, organized under the laws of Ohio, for its Research Department known, on March 17, 1953, as Institutum Divi Thomae."